## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | CIVIL ACTION H-09-1540 |
| PRIVATEFX GLOBAL ONE, et al., | § § | |
| *Defendant.* | § § | |
| | § | Consolidated With: |
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff,* | § § | |
| v. | § § | CIVIL ACTION H-09-1541 |
| PRIVATEFX GLOBAL ONE, et al., | § § | |
| *Defendant.* | § § | |

## ORDER

Pending before the court is a motion to approve a plan of distribution (Dkt. 133), which was filed by the court-appointed receiver, Thomas L. Taylor, III ("Receiver"). Certain investors in an offering by PrivateFX Global One ("Global One Investors") have filed an objection to the proposed plan. Dkt. 138. Wells Fargo Bank, N.A., which is a creditor of defendant Daniel J. Petroski, also filed an objection. Dkt. 139. Additionally, the Global One Investors have filed a motion to intervene. Dkt. 138. Having considered the motion to approve the plan of distribution, the content of the proposed plan, which is contained within the motion, the objections, and the applicable law, the court is of the opinion that the motion to approve the plan (Dkt. 133) should be GRANTED, the objections (Dkts. 138, 139) OVERRULED, and the plan APPROVED. Additionally, the Global One Investors' motion to intervene (Dkt. 138) should be DENIED.

## I. Background

The Securities and Exchange Commission ("SEC") and the Commodity Futures Trading Commission ("CFTC") each filed a complaint against defendants which alleged violations of certain securities and commodities laws.  Dkt. 55.  The court consolidated the SEC and CFTC cases.  Dkt. 11.  The court found good cause to believe that defendants Global One, 36 Holdings Ltd., Robert D. Watson, and Daniel J. Petroski engaged in acts and practices constituting violations of Commodity Exchange Act and the Securities Exchange Act.  Dkts. 10, 12, 13.  The court therefore froze the assets owned, controlled, managed, or held by or for the benefit of these defendants and appointed the Receiver.  *Id.*  The court eventually entered consent orders of preliminary injunctions as to these same defendants.  Dkts. 28-31.

The defendants and the CFTC reached an agreement and consented to the entry of a permanent injunction.[1]  Dkt. 92.  The defendants did not admit or deny the facts outlined in the consent order, but they did agree that all of the facts "shall be taken as true and correct and be given preclusive effect, relating to any claim made by CFTC."  *Id.*  The consent order indicates that the defendants "began raising funds from U.S. investors through an unregistered offering of up to $45 million in Global One shares."  *Id.*  The defendants informed investors that Global One would "'speculate in foreign currency inter-bank markets based upon a proprietary intra-day and weekly dealing model.'"  *Id.* (quoting a memorandum issued by defendants).  The defendants claimed that Global One had "never had an unprofitable month of forex trading."  *Id.*  The defendants further advised that Global One would employ the services of 36 Holdings.  *Id.*  "The Global One offering raised approximately $21 million from at least 80 investors."  *Id.*  Global One sent statements to its investors indicating that "substantially all of Global One's income came from purported forex

---

[1] The SEC has not yet reached an agreement with defendants, though it is in discussions with Watson and Petroski.  *See* Dkt. 119.

trading." *Id.*  The statements demonstrated a consistent profit, despite the volatile nature of forex trading.  *See id.*  The statements were actually "false financial statements of Global One and 36 Holdings, based on information prepared by [defendant] Watson, that misrepresented forex trading activity and profits supposedly earned therefrom."  *Id.*

The Receiver determined that there are approximately 135 defrauded investors in these schemes, and the defrauded investors have asserted claims exceeding $85 million.  Dkt. 133. According to the Receiver, defendant 36 Holdings was "the fulcrum in a number of continuing forex trading schemes" and that "Global One. . . was the latest vehicle employed in the ongoing fraud and its investors were the most recently defrauded by Defendants' trading schemes which have victimized numerous other investors."  *Id.*

The Receiver has recovered approximately $15 million from the receivership estate, which consists of assets of the defendants and related entities ("Receivership Estate").  Dkts. 15, 51, 133. The Receiver requests that the court authorize an interim distribution of $12 million, which he proposes should be distributed to each investor on a pro rata basis, "based upon their net out-of-pocket loss as a percentage of the total out-of-pocket losses of all of the Investors."  Dkt. 133 at 12. The Receiver proposes to retain approximately $1,630,000 "to use to protect the Receivership Estate's interests in assets and conclude the efforts of the Receiver," including taxes, administration of the wind down of the Receivership Estate, and conclusion of litigation and asset sales that will benefit the Estate.  *Id.*  The Receiver proposes to make an additional distribution at the conclusion of the Receivership.  *Id.* at 12-13.

## II.  GLOBAL ONE'S OBJECTIONS TO THE PLAN

The Global One Investors are opposed to the Receiver's plan of distribution.  They hired a forensic accountant who declares that at least $10.6 million of the funds in the Receivership Estate were contributed by the Global One Investors, were originally placed in separate and distinct bank

accounts, have always remained under the separate control of Global One in those accounts, and remained separate until the Receiver took possession of all of the defendants' assets. Dkt. 138 at 2. The Global One Investors assert that these assets should be returned to them rather than distributed under the Receiver's plan, as the other investors who would benefit from the funds if distributed on a pro rata basis did not invest in a distinct investment program and cannot trace the assets they contributed. *Id.* The Global One Investors advocate for the adoption of a plan prepared by their forensic accountant, which allows for a pro rata distribution to the Global One Investors of the funds that the forensic accountant determined had remained segregated in the Global One accounts and a pro rata distribution of the remaining funds at the discretion of the Receiver. *Id.* & Dkt. 138, Exh. A.

The Receiver argues that a pro rata distribution is appropriate in this case because providing later investors in a Ponzi-type scheme "the opportunity to recover a larger portion of the funds would elevate positions of investors based merely on the 'actions of the defrauders.'" Dkt. 143 at 12 (quoting *United States v. Durham*, 86 F.3d 70, 72 (5th Cir. 1996)). The Receiver claims that pro rata distribution "ensures equity and is the only fair way to treat all the investors harmed by the Defendants' fraud." *Id.* at 8.

## A.     The Original Ponzi Scheme

In 1924, the Supreme Court issued an opinion in an appeal of six suits brought by the trustee of the bankruptcy of the original Ponzi schemer–Charles Ponzi. *Cunningham v. Brown*, 265 U.S. 1, 44 S. Ct. 424 (1924). Charles Ponzi began his "remarkable criminal financial career" with capital of $150.00. *Id.* at 7. Ponzi "spread the false tale that on his own account he was engaged in buying international postal coupons in foreign countries and selling them in other countries at 100 per cent. [sic.] profit, and that this was made possible by the excessive differences in the rates of exchange following the war." *Id.* He promised investors $150 for every $100 they loaned him, and he

4

promised to pay within 90 days.  *Id.*  Then, he paid the original investments back within 45 days rather than the 90 promised, thus inducing the investors to loan more.  *Id.* at 8.  He had received $9,582,000 within 8 months, and he had issued notes for $14,374,000.  *Id.*  He actually made no investments whatsoever, so "all the money he had at any time was solely the result of loans by his dupes."  *Id.*

The six cases on appeal involved investors who were able to withdraw their investments, which had been deposited at the Hanover Trust Company, after the Ponzi scheme was revealed to the public but four months before Ponzi filed for bankruptcy.  *Id.*  The lower courts determined that the investors, by withdrawing the original funds they invested rather than the amount of the promissory notes, had rescinded their loan contracts for fraud, and that the investors who had failed to do so were merely creditors of the bankruptcy estate.  *Id.* at 9.  The Supreme Court disagreed, noting that Ponzi had "adopted the practice of permitting any who did not wish to leave his money for 45 days to receive it back in full without interest," and the six defendants were merely taking advantage of this agreement.  *Id.* at 10.  The Supreme Court held that the six defrauded lenders were merely creditors of the estate, noting that after the date on which the news media declared Ponzi insolvent, "the victims of Ponzi were not to be divided into two classes, those who rescinded for fraud and those who were relying on his contract to pay them.  They were all one class, actuated by the same purpose to save themselves from the effect of Ponzi's insolvency. . . . [T]hey were, in their inability to identify their payments, creditors and nothing more.  It is a case the circumstances of which call strongly for the principle that equality is equity . . . ."  *Id.* at 12-13.

## B.    Legal Standard

Ponzi's scheme was unfortunately only the beginning of many different variations of the same type of fraud.  District courts considering how to treat the investors who have bought into such schemes must determine the most equitable remedy, and they are "vested with broad discretionary

5

power" to do so. *SEC v. Forex Asset Mgmt. LLC*, 242 F.3d 325, 331 (5th Cir. 2001) (quotations and alterations omitted). "Sitting in equity, the district court is a 'court of conscience.'" *Durham*, 86 F.3d at 73 (quoting *Wilson v. Wall*, 73 U.S. (6 Wall.) 83, 90, 18 L. Ed. 727 (1867)). When a portion of funds to be distributed from the assets of a receivership estate can be traced, it is permissible to apply tracing; however, it is also permissible to allow a pro rata distribution. *See Durham*, 86 F.3d at 73; *Forex*, 242 F.3d at 331. The court must therefore determine which type of distribution is most equitable under the facts of this case.

## C.     Analysis

The Global One Investors claim that it would be inequitable to allow the funds they invested that were always in a discrete account to be distributed among investors whose funds cannot be traced. Global One cites *Anderson v. Stephens*, 875 F.2d 76, 79-81 (4th Cir. 1989) and *SEC v. P.B. Ventures*, No. 90-5322, 1991 WL 269982 (E.D. Pa. Dec. 11, 1991) in support of this contention. In *Anderson*, the checks of two individuals who invested in an unregistered fraudulent commodity futures investment group were not deposited until after the district court had ordered that the bank account be frozen. *Anderson*, 875 F.2d at 77. The court-appointed receiver recommended that all funds that were deposited *after* the freeze order be returned to the individuals who made the investments, ahead of the distributions to investors whose funds were deposited before the freeze order. *Id.* at 78. The receiver reasoned that "the purpose of the freeze order was to maintain the status quo and prevent additional losses to the customers." *Id.* The other investors objected to the plan. *Id.* The district court rejected the portion of the receiver's plan that allowed the post-freeze deposits to be returned to the investors ahead of the pro rata distributions to the pre-freeze investors, noting that its freeze order did not specifically prevent deposits into the account. *Id.*

The investors seeking return of the post-freeze deposits appealed, and the Fourth Circuit reversed. *Id.* The Fourth Circuit acknowledged that it "is well settled that 'in an action brought to

enforce the requirements of remedial statutes as [the Commodity Exchange Act], a district court has broad discretion to fashion appropriate relief.'" *Id.* (quoting *CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978)).  However, the Fourth Circuit held that law and equity dictated that the post-freeze deposits should be returned in full because the freeze order froze the status of the account so as to "preserve the status quo of the investors."  *Id.* at 80.  Thus, the funds deposited after the freeze order were deposited after the cessation of business and should "not be included in the assets to be distributed on a pro-rata basis."  *Id.* at 80-81.  Here, the Global One Investors' funds were not deposited after Global One's accounts were frozen, so the Fourth Circuit's reasoning in *Anderson* simply does not apply to the facts of this case.

In *P.B. Ventures*, P.B. Ventures established an investment club in 1973 in which investors invested cash in exchange for notes guaranteeing an annual return of 24%.  *P.B. Ventures*, 1991 WL 269982, at *1.  The investments were deposited in an account at Advest, Inc.  *Id.*  In 1989, the defendants offered a second investment option, soliciting shares of stock in exchange for notes promising investors an annual return of 10%.  *Id.*  This stock investment option was known as "P.B. Ventures II."  *Id.*  P.B. Ventures characterized the investments of cash and stocks as "loans."  *Id.* The investors in P.B. Ventures II "endorsed their stock certificates to P.B. Ventures II, and signed stock authorization forms permitting Advest to place the stock certifications in 'street name' for margin purposes," but they were told that they would continue to own the stock and receive dividends.  *Id.*  However, P.B. Ventures' agreement with Advest, Inc. allowed Advest to sell the stock at any time, and Advest sold the stock, pursuant to this agreement, after the instigation of the SEC investigation.  *Id.* at *2.  After deducting the amount owed to Advest by P.B. Ventures from the proceeds of the stock sale, $399,000 was placed in an interest bearing account.  *Id. T*he district court ordered that these funds be returned to the investors.  *Id.*  The SEC recommended that the proceeds be distributed pro rata among all investors, but the court-appointed trustee recommended

that priority should be given to the P.B. Ventures II investors, as the funds from the stocks they invested could be directly traced to the Advest account. *Id.* The court determined that the trustee's recommendation was more equitable. *See id.* It reasoned that P.B. Ventures wrongfully converted the stock invested by the P.B. Ventures II investors when it placed the stock in an account subject to sale without consent. *Id.* at *3. It therefore concluded that the funds from the sale of the stock "were imposed with a constructive trust." *Id.* It specifically noted that if Advest had not liquidated the stocks, they would still be in the account. *Id.*

The *P.B. Ventures* court specifically acknowledges that "[n]o specific distribution scheme is mandated so long as the distribution is 'fair and equitable.'" *Id.* at *2. This court makes no finding with regard to the fairness of the *P.B. Ventures* court's decision, but if the court were to agree that the *P.B. Ventures* court's decision was fair and equitable under the facts of that case, it certainly would not lead to the conclusion that a similar result is fair and equitable in this case. This case is different from *P.B. Ventures* because the Global One Investors invested cash, a fungible asset, not stock shares that they believed would never be sold. The investment of stock, as opposed to cash, distinguished the P.B. Ventures II investors from the original P.B. Ventures investors in a more concrete way than the distinction the Global One Investors wish this court to make between them and the other investors. The Global One Investors claim that the funds from the Global One account should be returned solely to the Global One Investors because their funds were placed in separate and distinct bank accounts that were under the separate control of Global One. The forensic accountant indeed determined that $10,628,321.83 of the funds left in the Global One account when the assets were placed into receivership "is directly traceable on a dollar-for-dollar basis to investor deposits made directly to Global One SA accounts at third party institutions . . . and had been consistently maintained in bank accounts of Global One SA, separately from 36 Holdings, Ltd." Dkt. 138, Exh. A ¶ 4. However, she also noted that "$2,033,072.20 is attributable to transfers from

36 Holdings, Ltd." and that, from the inception of Global One SA, "Global One SA transferred $5,026,799.37 to 36 Holdings, Ltd. and received transfers from 36 Holdings, Ltd. of $2,033,072.20." *Id.* ¶¶ 4, 10. Thus, while some of the funds remaining when the accounts were frozen can be traced to the Global One Investors, it is clear that their funds were being used in the same fraudulent scheme as the funds from other investors and that the Global One Investors have only been able to trace the $10.6 million because the perpetrators of the fraud did not use their money before the scheme was stopped.

*United States v. Durham* and *SEC v. Forex Asset Management LLC*, Fifth Circuit cases that are binding on this court, are more on point. In *Durham*, the defendants operated an advance fee loan financing business in which they obtained money from consumers by representing that they could obtain financing for large projects or, in some cases, directly finance the projects. *Durham*, 86 F.3d at 71. They received $806,750 from 13 entities or individuals, and only $83,495.52 was left when the FBI discovered the scheme and arrested the defendants. *Id.* The defendants were indicted, and the district court froze the defendants' assets and proposed to distribute the remaining funds to all 13 investors. *See id.* The bulk of the funds could be traced to seven individuals, four of whom filed claims. *See id.* at 72. The defendants had already "deposited and withdrawn almost all of the money defrauded from the other claimants." *Id.* The district court decided to distribute the funds pro rata rather than giving the bulk of the funds to the victims whose funds had been traced, even though, if tracing were applied, $70,970.13 of the $83,495.52 would go to one company–Claremont Properties, Inc. *See id.* The district court reasoned that "'all claimants stand equal in terms of being victimized by the defendant defrauders. The ability to trace the seized funds to Claremont and Northernaire is the result of the merely fortuitous fact that the defrauders spent the money of the other victims first. Allowing Claremont and Northernaire to recover from the funds seized to the

exclusion of the other victims under the tracing principle would be to elevate the position of those two victims on the basis of the actions of the defrauders.'" *Id.* (quoting the district court).

Claremont appealed the district court's decision. The Fifth Circuit stated that "tracing would have been permissible under the circumstances of this case" and that "Claremont identified its funds and had a right *to seek* imposition of a constructive trust on the traced funds. . . . However, the court, in exercising its discretionary authority in equity, was not obliged to apply tracing." *Id.* at 73. The Fifth Circuit affirmed the district court's decision, noting that "the lower court in the instant case rationally considered the positions of the victims and held that following the tracing principle would be inequitable." *Id.*

Here, the Global One Investors, like Claremont, stand to receive the bulk of the remaining funds if the court allows the funds from the Global One account to be reserved for the Global One Investors. This would leave the other investors, who were duped just like the Global One Investors, without a significant recovery. It would be inequitable to elevate the position of the Global One Investors over the other investors simply because the defrauders had not depleted the funds in the Global One account before the scheme was stopped.

*SEC v. Forex Asset Management LLC*, further bolsters this conclusion. In *Forex*, Michael and Donna Whitbeck initially invested $100,000 in an alleged foreign currency investment opportunity offered by Forex Asset Management, L.L.C. *Forex*, 242 F.3d at 327. They received a statement showing a profitable return on the $100,000, and decided to invest $800,000 more. *See id.* The individual who controlled Forex, Kosova, deposited the $800,000 check into an account held by FAM Preferred Trading Corporation at NationsBank. *See id.* It is the only check that was deposited in that account. *See id.* Kosova then transferred $750,000 from the FAM Preferred Trading account into a brokerage account with Rosenthal Collins Group, L.P. *See id.* This $750,000 was the only deposit made into that account. *See id.* The SEC filed a complaint against Kosova and

10

Forex for allegedly engaging in a scheme to defraud investors, and their assets were frozen.  *Id.* at 327-28.  A receiver was appointed, and the receiver determined that a pro rata distribution of the assets was appropriate because the there were no secured claims.  *Id.* at 328.

The Whitbecks objected to the plan, arguing that the $800,000 check was deposited in a segregated account and that they should receive all of the funds that remained in that account.  *Id.* The district court affirmed the receiver's plan, noting that it was "'the most equitable means of addressing all of the victim's harms[,] . . . [and] the Whitbecks [did] not present[] any facts that would elevate their claims above those of the other investors.'"  *Id.* (quoting the district court).  The Whitbecks appealed.  The Fifth Circuit noted that tracing is permissible but that a district court may also determine that tracing is inequitable after considering "the positions of the various investors and applying its discretion."  *Id.* at 331 (citing *Durham*, 86 F.3d at 72-73).  The Fifth Circuit held that the district court did not abuse its discretion when it rejected the Whitbecks' claim because, in determining that a pro rata distribution was fair and equitable, the district court carefully considered the Whitbecks' arguments and "'used its discretion in a logical way to divide the money.'"  *Id.* (quoting *Durham*, 86 F.3d at 73).

The Whitbecks argued that the court should not rely on its previous decision in *Durham* because *Durham* involved tracing, and their funds were actually in a separate account and never commingled.  Id.  The Fifth Circuit stated that this was "a distinction without a difference."  *Id.*  It noted that "it may have been permissible in *Durham* for the district court to have traced the funds, and . . . it may have been permissible in the present case for the district court to have allocated all of the segregated funds to the Whitbecks, [but] in neither case was the district court required to choose the remedy requested by" the investors opposed to the pro rata distribution.  *Id.* at 331-32.

The Global One Investors claim that *Forex* is not on point because they claim that the Fifth Circuit did not address the issue regarding whether, when a scheme involves more than one

11

investment program, the investors in each program are entitled to priority in the assets from that particular program because the argument was not raised in the district court. Dkt. 138. The Global One Investors then state, "[b]ecause of this defect, the Fifth Circuit affirmed the district court's approval of the receiver's plan of distribution." *Id.* at 11. However, the Fifth Circuit actually affirmed because it determined that the district court *considered the Whitbecks' arguments* and used its discretion to divide the money in a logical way. While the Whitbecks did not raise their argument relating to fraudulent schemes with more than one investment program before the district court, the Whitbecks did argue that they should receive all of the funds because their check was placed in a segregated account. *See Frorex*, 242 F.3d at 328 (discussing the arguments made before the district court). The district court decided, notwithstanding the separate account that only contained funds from the Whitbecks' investment, that it was fair and equitable to include those funds in a general pro rata distribution for all investors, and the Fifth Circuit affirmed. It is likewise fair and equitable in this case to include the funds from the Global One account in a pro rata distribution to all investors, including the Global One Investors, because even though the Global One Investors only invested in the Global One accounts, it would be unfair for them to receive the bulk of the funds left from the fraudulent scheme of which the Global One accounts were a part simply because the funds they invested had not yet been dissipated.[2]

---

[2] The Global One Investors also argue that their position is stronger than the position of the Whitbecks because they, unlike the other investors in this case, specifically bargained for a distinct investment program with a distinct identity and structure, and they "verified that the books were maintained and that funds were separate and accounted for." Dkt. 138 at 11 n.3. However, in *Forex*, Kosova specifically informed the Whitbecks when they made their $800,000 investment that "their funds would be placed in a separate account in order to invest the money more aggressively." 242 F.3d at 327. And, the Whitbecks' funds were indeed placed in a separate account and not intermingled with the other investment funds. *See id.* In this case, some of the Global One funds were intermingled with funds from the 36 Holdings, Ltd. account. *See* Dkt. 138, Exh. A (noting that "Global One SA transferred $5,025,799.37 to 36 Holdings, Ltd. and received transfers from 36 Holdings, Ltd. of $2,033.072.20"). Thus, the Whitbecks' argument was actually stronger than the Global One Investors' argument.

The court acknowledges that $10.6 million of the $12 million that the Receiver proposes to distribute at this juncture can be traced to investor deposits made directly to Global One SA accounts. *See* Dkt. 138, Exh. A. However, after taking this into consideration, the court finds that it would be unfair to elevate the position of the Global One Investors over the other defrauded investors simply because the funds in the Global One accounts had not yet been reached. The court therefore overrules the Global One Investors' objection and GRANTS the receiver's motion for approval of the plan for distribution (Dkt. 133). The receiver's plan is APPROVED. The receiver shall distribute the $12 million, and "each Investor, regardless of which Receivership entity the Investor deposited his [or her] funds, will share in the distribution based upon [his or her] out-of-pocket loss as a percentage of the total out-of-pocket losses of all of the Investors."[3] Dkt. 133 at 12.

### III. Global One's Motion to Intervene

The Global One Investors also request to intervene. They claim that intervention is mandatory under Federal Rule of Civil Procedure 24(a). Alternatively, they request permissive intervention under Federal Rule of Civil Procedure 24(b). *See* Dkt. 138. The Receiver claims that intervention is not proper under either rule. *See* Dkt. 143.

Under Rule 24(a), the court must permit anyone to intervene who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a). In the Fifth Circuit, a party

---

[3] The Global One Investors also claim that the Receiver's plan would allow investors who have already received some return on their investments (likely via other contributors) to keep these returns and then receive some portion of the property belonging to the Global One Investors. Dkt. 138 at 12-13. This argument is completely without merit, as the Receiver's plan calls for a pro rata distribution on the basis of each investor's *net out-of-pocket loss*. *See* Dkt. 133. The returns these investors have already received would necessarily be subtracted when calculating the out-of-pocket loss for that investor.

seeking intervention as a matter of right must show the following: "(1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair his ability to protect that interest; [and] (4) the applicant's interest must be inadequately represented by the existing parties to the suit." *Taylor Commc'ns Grp., Inc. v. Sw. Bell Tel. Co.*, 172 F.3d 385, 386 (5th Cir. 1999). "Failure to meet any one of these requirements is fatal to a claim of intervention as of right." *Id.*

The motion to intervene is timely, as the Global One Investors filed it within a reasonable time after the Receiver filed the proposed plan that allegedly infringes upon their right to the funds to which they claim they are entitled. The second prong is also met, as the Global One Investors unquestionably have an interest in the property that is the subject of this action. The Global One Investors, however, cannot meet their burden with regard to the third and fourth prongs. The Global One Investors cannot show that their ability to protect their interests is impaired by not being an actual party to this litigation. The Global One Investors have been given the opportunity to object to the planned disbursement of the funds to which they claim they are entitled, and the Fifth Circuit has ruled, in *Forex*, that investors like the Global One Investors have standing to appeal.[4] *See Forex*, 242 F.3d at 330. With regard to the last prong, the Receiver is charged with protecting the interests of all the investors, and the court does not view the Receiver's request to distribute the $12 million

---

[4] The Global One Investors indicate that they need to be a party to take discovery. The Receiver claims that he "has met with the Global One Investors on numerous occassions [sic.] and provided them with access to all relevant documents concerning the basis of [their] objections." Dkt. 143 at 22 n.5. It appears that the Global One Investors have received the documentation they needed to support their objection to the Receiver's plan, and the court cannot imagine what other discovery the Investors may need. If, however, the Global One Investors reach a point where they believe they need information from the Receiver and the Receiver is not complying, the court encourages the Investors to file a renewed motion for intervention, which the court will certainly entertain if it finds there is a genuine need for discovery.

14

pro rata as infringing upon the interest of the Global One Investors.  The Receiver's response to Wells Fargo's opposition to its plan is demonstrative of Receiver's efforts to protect the interests of the investors.  In the response to the opposition, the Receiver states that his "primary duty in a[n] SEC enforcement action where investors were victimized by a Ponzi scheme is to marshal assets for the benefit of those investors."  Dkt. 142.  The Receiver therefore advocates for the court to place the claims of the victims over the claims of general creditors.  *See id.*  Thus, the Receiver is looking out for the interests of all investors.  The Global One Investors have not demonstrated that they are entitled to intervention as a matter of right.

Under Rule 24(b), the court may, on a timely motion, permit intervention to anyone who is either "given a conditional right to intervene by a federal statute; or . . . has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b).  Permissive intervention is "wholly discretionary" with the Court even if all elements are met.  *New Orleans Pub. Serv., Inc. v. United Gas Pipeline Co.*, 732 F.2d 452, 471 (5th Cir. 1984).  Moreover, in exercising that discretion, "the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  "In acting on a request for permissive intervention, it is proper to consider, among other things, 'whether the intervenors' interests are adequately represented by other parties,' . . . whether they 'will significantly contribute to the full development of the underlying factual issues in the suit,'" "'the nature and extent of intervenors' interest,' . . . and 'their standing to raise relevant legal issues.'"  *Id.* at 472 & n.40 (quoting *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326, 1329 (9th Cir. 1977)).

Here, the Global One Investors have a claim that shares a common question of law or fact with the claims of the SEC, CFTC, and the Receiver, all of which are involved in this action to protect the interests of those who invested in defendants' fraudulent scheme, including the Global One Investors.  The Receiver claims that allowing the Global One Investors to intervene "would

15

cause unnecessary delay in the adjudication of the underlying dispute, additional expense, and complication to the Receivership Estate." Dkt. 143. Specifically, the Receiver claims that the intervention would delay "the proposal of a final distribution plan . . ., [consume] the assets available for distribution" and lead to other investors seeking to intervene, which would change an otherwise orderly process into "a morass of competing investor claims consuming significantly more of the Receiver's . . . time." *Id.* Taking into consideration these arguments as well as the points that the Global One Investors' interests are already being protected, the court finds that permissive intervention is not warranted. Accordingly, the Global One Investors' motion to intervene is DENIED.

### IV. WELLS FARGO'S OBJECTION TO THE PLAN

Wells Fargo extended a $500,000 line of credit to defendant Daniel J. Petroski in April 2006. Dkt. 139. Petroski defaulted on the loan agreement, and, as of June 28, 2010, owes Wells Fargo $508,143.82. Wells Fargo submitted a notice of claim to the Receiver in an effort to recover the funds. The Receiver's distribution plan proposes distributing $12 million to *investors*, and it does not provide for the compensation of creditors like Wells Fargo. Wells Fargo argues that it, like the investors, is a victim of fraud, as Petroski allegedly misrepresented his ability to pay back the line of credit. Dkt. 139. Wells Fargo claims that allowing creditors to receive part of the distribution will only reduce the investors' claims slightly, but failing to include creditors in the distribution will result in extreme prejudice to creditors, who will receive none of the $12 million and who "will be left with almost nothing at the end of the day." *Id.* Thus, Wells Fargo contends that it and other similarly situated creditors should receive equitable distributions just like the investors. *Id.* Wells Fargo, however, did not cite any caselaw to support its position.

The Receiver argues that courts regularly grant defrauded investors a higher priority than defrauded creditors, and it cites persuasive authority supporting this view. Dkt. 142. For instance,

in *Quilling v. Trade Partners, Inc.*, No. 1:03-CV-0236, 2006 WL 3694629 (W.D. Mich. Dec. 14, 2006), the U.S. District Court for the Western District of Michigan adopted a magistrate judge's recommendation to reject the objection to a receiver's distribution plan that was filed by a creditor. The magistrate judge noted that as "an equitable matter in receivership proceedings arising out of a securities fraud, the class of fraud victims takes priority over the class of general creditors with respect to proceeds traceable to the fraud." *Quilling*, 2006 WL 3694629, at *1.

As discussed above, the court must determine whether the Receiver's plan is equitable. The Receiver proposes to distribute the funds to the direct victims of the fraud that is at issue in this proceeding. Wells Fargo makes a conclusory allegation that it, too, is the victim of fraud, and argues that it should therefore be on equal footing with the investors.[5]  However, even if Wells Fargo had shown that the representations made by Petroski in order to receive an increase in his credit line were fraudulent, it has not linked these statements to the fraud at issue here. The credit application states that Petroski was requesting the increase in his credit limit to pay off "his loan with Compass Bank" and that he would also move his investments to Wells Fargo. Dkt. 139, Exh. 1-A. The document in no way implies that Petroski was obtaining the loan to finance the fraudulent investment scheme. While it is clear that the funds the Receiver has collected include funds provided by the investors, there is simply no evidence that the money Wells Fargo loaned to Petroski was ever put into these accounts. The court does not question that Wells Fargo has a claim, but it does question whether, based on the record before it, Wells Fargo is entitled to equal footing with the defrauded investors. The court, exercising its broad equitable powers, agrees with the Receiver that the most equitable

---

[5]  The court notes that it is Well Fargo's business to review applications for credit and determine whether they are valid. Wells Fargo is a sophisticated financial institution. Thus, it is difficult to place Wells Fargo's claim of victimization on the same plane as that of the duped investors.

distribution of the $12 million is the distribution proposed in the plan.[6]  Therefore, Wells Fargo's objection is OVERRULED.

## V. Conclusion

The Global One Investors' and Well Fargo's objections to the Receiver's plan (Dkts. 138, 139) are **OVERRULED**.  The Receiver's motion for approval of its plan of distribution (Dkt. 133) is **GRANTED**.  The Receiver's plan, which is contained within its motion, is **APPROVED**.  The Global One Investors' motion to intervene (Dkt. 138) is **DENIED**.

Signed at Houston, Texas on March 11, 2011.

_____
Gray H. Miller
United States District Judge

---

[6] The court reaches no conclusions at this point about whether the Receiver should give more weight than it has currently given to the creditors' claims when it proposes to distribute the funds remaining after the receivership estate is wound up.